IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MANAGEMENT ASSOCIATION FOR )
PRIVATE PHOTOGRAMMETRIC )
SURVEYORS, )
)
COUNCIL ON FEDERAL )
PROCUREMENT OF )
ARCHITECTURAL )
AND ENGINEERING SERVICES, )
)
NATIONAL SOCIETY OF )
PROFESSIONAL ENGINEERS, )
)   Civil Action No. 1:06cv378
AMERICAN SOCIETY OF CIVIL )
ENGINEERS, )
)
    Plaintiffs, )
)
           v. )
)
UNITED STATES OF AMERICA, )
)
    Defendant. )
)

**MEMORANDUM OPINION**

In this APA[1] suit, four trade associations of surveyors and engineers challenge a regulation promulgated by the Federal Acquisition Regulatory Council ("FAR Council") that allows federal agencies to procure mapping services based on competitive bidding, a practice plaintiffs allege is (i) contrary to the engineers' professional codes in several states and (ii) inconsistent with the language of the Brooks Architect-Engineer Act, 40 U.S.C. § 1101 *et seq.* ("Brooks Act"). They seek a declaration to that effect, along with an injunction prohibiting

---

[1] The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

enforcement of the regulation, and a mandatory injunction requiring the FAR Council to promulgate a regulation consistent with their interpretation of the Brooks Act. The government responds by arguing that plaintiffs lack the requisite constitutional and prudential standing to challenge the regulation, which the government claims is, in any event, fully consistent with the dictates of the Brooks Act.

At issue on the government's threshold Rule 12(b)(1), Fed. R. Civ. P., motion to dismiss for lack of subject matter jurisdiction is whether, as the government contends, plaintiffs lack the required constitutional and prudential standing to challenge the regulation at issue. For the reasons that follow, the motion fails.

**I.**

Plaintiffs are four trade associations of surveyors and engineers. They sue to vindicate the interests of their members, individual surveyors and mappers, whom they allege are unable to compete for government mapping contracts procured competitively because certain state ethics codes for surveyors forbid competitive bidding.

The FAR Council, which promulgated the challenged regulatory provision, is an administrative body composed of the Secretary of Defense, the Administrator of National Aeronautics and Space, the Administrator of General Services, and the Administrator for Federal Procurement Policy. 41 U.S.C. § 421(b). The Council's *raison d'etre* is "coordination of government-wide procurement policy . . . and regulatory activities." 41 U.S.C. § 421(a). More specifically, the FAR Council is responsible for promulgating and updating a single government-wide regulation establishing government procurement practices, known as the Federal

Acquisition Regulation. *See* 41 U.S.C. § 421(f).[2] The challenged portion of the Federal Acquisition Regulation, 48 C.F.R.§ 36.601-4(a)(4), is an interpretation of the Brooks Architect-Engineers Act ("Brooks Act"), a 1972 statute regulating the federal government's procurement of architectural and engineering services. *See* 40 U.S.C. § 1101 *et seq.* The Brooks Act implements a Congressional policy of procuring "architectural and engineering services" for government projects based only on the qualification of firms bidding on the project. *See* 40 U.S.C. §§ 1101, 1103-04. This form of selecting contractors is commonly known as "qualification-based selection" or QBS. In selecting a contractor via QBS, an agency solicits statements from contractors about their qualifications, selects the most qualified contractor, and attempts to negotiate a reasonable price with that contractor. 40 U.S.C. § 1103, 1104(b). In the event negotiations fail to produce a fair price with that contractor, the agency proceeds to negotiate with the next most-qualified contractor, and so on, until it can negotiate a fair price from a qualified contractor. *Id.* Under QBS, there is no competitive bidding for the lowest price.

Since the Brooks Act requires only "architectural and engineering services" to be procured via QBS, other types of services are not subject to its strictures and may be secured by way of competitive bidding. Hence, whether a service must be procured via QBS turns on whether it is an "architectural or engineering service" within the meaning of the Brooks Act. In 1988, Congress amended the Brooks Act to define architectural and engineering services as

> professional services of an architectural or engineering nature, as defined by state law, if applicable, that are required to be performed or approved by a person licensed, registered or certified to provide the services described in this paragraph

---

[2] The Federal Acquisition Regulation is in fact a voluminous set of regulatory provisions beginning at 48 C.F.R. § 1.000 and including the provision here at issue, 48 C.F.R.§ 36.601-4(a)(4), which was promulgated by the FAR Council in 1991.

> . . . [and] other professional services of an architectural or engineering nature, or incidental services, which members of the architectural or engineering professionals (and individuals in their employ) may logically or justifiably perform, including . . . surveying and mapping.

40 U.S.C. § 1102 (1988).

The challenged regulatory provision is the FAR Council's interpretation and implementation of this 1988 Brooks Act amendment. This provision states that mapping associated with real property "planning, development, design, construction or alteration" is considered an "architectural and engineering service" and thus must be procured by QBS. 48 C.F.R. § 36.601-4(a)(4). Yet, the challenged provision also states that "mapping services that are not connected to traditionally understood or accepted architectural and engineering activities, are not incidental to such architectural and engineering activities or have not in themselves traditionally been considered architectural and engineering services" are not architectural and engineering services, and therefore "shall be procured" by other procedures including, potentially, competitive bidding.[3] *Id.* The plaintiffs' argument on the merits, succinctly put, is that the challenged regulatory provision is inconsistent with the Brooks Act because the Act requires that all federal contracts for mapping services must be procured by QBS, while the

---

[3] In this regard, the challenged provision provides that mapping services that are not architectural and engineering services shall be procured "pursuant to provisions in parts 13 [Simplified Acquisition Procedures], 14 [Sealed Bidding], and 15 [Contracting by Negotiation]." *Id.* Both Simplified Acquisition procedures and Sealed Bidding can involve solicitation of competitive bids. *See* 48 C.F.R. §§ 13.104, 13.106-1, 13.106-3(a)(1) (Simplified Acquisition Procedures); 48 C.F.R. § 14.408-1(a)(3) (Sealed Bidding). Contracting by Negotiation also contemplates that bids will sometimes be solicited in a "competitive environment," although price, in this context, is only one factor the procurement official must evaluate when making a procurement decision. *See* 48 C.F.R. § 15.002(b); 48 C.F.R. § 15.304(c)(1). For ease of reference, bidding or procurement that occurs via these processes is referred to throughout collectively as "competitive" or "non-QBS" bidding or procurement.

challenged regulatory provision exempts some mapping services from QBS.

At issue, however, on this threshold jurisdictional motion is not the merits, but plaintiffs' standing to sue. Plaintiffs assert that in states with ethics codes that prohibit engineers from participating in non-QBS selections,[4] their members suffered injury in fact when they were precluded from competing for federal mapping contracts subject to competitive bidding pursuant to the challenged regulatory provision. The government responds that plaintiffs lack the injury in fact required for constitutional standing because they have identified no such injured member, nor have they identified a specific mapping contract procured by a federal agency through competitive bidding in a state where surveyors or engineers are prohibited from participated in such competitive bidding. The government further points out that plaintiffs have not identified any of their members who have been disciplined or threatened with discipline for bidding competitively. Moreover, in the government's view, where state law would prohibit such competitive bidding, but federal law would allow it, state law is preempted, thereby removing any obstacle to competitive bidding in those circumstances. The parties also dispute whether plaintiffs satisfy the prudential "zone of interests" test required for APA standing.

## II.

There are, in general, two species of standing: (i) constitutional and (ii) prudential. Both are in issue here and each is separately addressed. Before doing so, however, it is important to describe briefly the proper procedure for resolution of standing challenges.

---

[4] *See e.g.* Ala. Admin. Code R. § 330-X-14-.05(f) ("the engineer or land surveyor shall not participate in procurement practices (bid submittals) which do not first determine the qualifications of the engineer or land surveyor prior to entering into fee negotiations for services being sought..."); S.C. Code Ann. Regs. § 49-305 ("The Engineer or Land Surveyor shall solicit and accept work only on the basis of his qualifications.").

Standing, of course, is jurisdictional; its existence is a prerequisite to finding that a court has the power to adjudicate the cause. As such, standing is appropriately challenged via a motion pursuant to Rule 12 (b)(1), Fed. R. Civ. P., and it is a plaintiff's burden to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citing *FW/PBS v. Dallas*, 493 U.S. 215, 231 (1990)). Whether the analysis required to resolve a standing challenged is confined to the complaint's allegations or extends to evidence outside the pleadings depends on the nature of the challenge, of which there are two general types: (i) a claim that the allegations, even if true, do not establish standing, and (ii) a claim that the standing allegations are not true. *See e.g. Crutchfield v. U.S. Army Corps of Engineers*, 230 F. Supp. 2d 687, 695 (E.D.Va. 2002); 5B Wright and Miller, *Federal Practice and Procedure*, § 1350 (3rd ed. 2004). The former type of challenge is typically resolved at the threshold stage without the need to consider evidence beyond the complaint's allegations. *See Crutchfield v. U.S. Army Corps of Engineers*, 230 F. Supp. 2d at 695. The latter type of challenge typically involves consideration of materials and evidence beyond the complaint's four corners, and in many cases the issue is not resolved until the summary judgment stage or thereafter. *See e.g. Moore's Federal Practice* § 12.30[2] ("The truth of jurisdictional allegations need not always be determined with finality at the threshold . . . ") (citing *Jerome v. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38 (1995)).

The standing challenge at issue here includes claims of both types. As explained below, the challenge to the sufficiency of the standing allegations fails, while resolution of the claim that challenges the truth of the standing allegations must await further development of the record.

**III.**

*A. Constitutional Standing*

The appropriate starting point for analysis of plaintiffs' standing is the constitutional or Article III standing issue, as the absence of this species of standing deprives a court of the power to adjudicate anything further about the case. *See Warth v. Sedlin*, 422 U.S. 490, 498 (1975) (standing, as a component of justiciability, is "the threshold question in every federal case, determining the power of the court to entertain the suit."). It is axiomatic that for a plaintiff to have standing to sue under Article III of the Constitution, he must allege an injury in fact (i) that is "concrete and particularized," not "conjectural or hypothetical", (ii) that is fairly traceable to the defendant's conduct, not the conduct of a third party, and (iii) that will likely prove redressable via a favorable ruling from the court. *Lujan,* 504 U.S. at 560-561. Further, since the instant plaintiffs are associations, they must demonstrate what is commonly termed "associational standing," *i.e.* (i) that some of their individual members would have standing to sue as individuals, (ii) that the interests at stake are germane to the organizations' purposes, and (iii) that neither the claim asserted nor relief requested requires the participation of individual members. *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000).

*1. Injury in Fact*

Plaintiffs allege their members were injured because they could not compete for those federal mapping contracts procured through non-QBS procedures, pursuant to the challenged regulatory provision. The government appropriately does not dispute that an inability to compete for government contracts as a result of unlawful government action is a cognizable injury in fact.[5]

---

[5] While most inability-to-compete challenges arise in the equal protection context, those cases clearly establish the principles, equally applicable here, that (i) the inability to compete for government benefits or contracts on equal terms with others similarly situated as a result of an

Instead, it argues that plaintiffs have not pointed to any specific contracts for which their members could not compete, nor to any actual or threatened disciplinary action had they attempted to do so. From this, the government argues, it follows that any alleged injury in fact is only hypothetical and not sufficiently concrete to avoid dismissal of the complaint on standing grounds.

This challenge to the sufficiency of the standing allegations fails, as the complaint's allegations of injury to plaintiffs' members, supplemented by the affidavit of John Palatiello, suffice to satisfy the pleading standard applicable at this stage. To be sure, these allegations are general in nature; no specific member of any of the plaintiff associations is identified as having been precluded from competing for a non-QBS federal mapping contract, nor is any such contract identified.[6] Yet as *Lujan* teaches, general allegations of injury of this sort are sufficient at this

---

unlawful government regulation is a cognizable injury in fact, and (ii) a would-be competitor need not show that it actually would have received the contract or benefit, only that it was ready to compete for it. *See e.g. Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (non-minority contractors had standing to assert equal protection challenge to minority set-asides, finding injury in the challengers' inability to compete on equal terms with minority firms and stating that a challenger need not demonstrate that it actually would have received the contract); *Price v. City of Charlotte*, 93 F.3d 1241, 1248 (4th Cir. 1996) (finding standing to challenge to minority set-aside in police department, stating that the "appellees were not competing on a level playing field"). These cases support the conclusion that when an aspiring contractor (or other competitor for a government benefit) is denied the opportunity to compete because of allegedly unlawful government action, he experiences a cognizable injury in fact for standing purposes. Moreover, as a matter of common sense, a plaintiff is no less injured when the government program is unlawful for sub-constitutional reasons rather than constitutional ones, or when the program challenged is an entire procurement scheme rather than a set-aside within a larger program.

[6] John Palatiello, Executive Director of plaintiff Management Association for Private Photogrammetric Surveyors, avers in his affidavit that "engineers and surveyors that are licensed in [states that prohibit non-QBS bidding] are prohibited from bidding on federal contracts for mapping in which the procurement officials are failing to use the QBS process" and that they "face significant barriers to participating in the procurement" of mapping services.

stage of the litigation. *Lujan*, 504 U.S. at 561 ("general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support a claim.") (internal quotations and citations omitted). But this is not a final resolution of the standing issue; plaintiffs must soon, at the summary judgment stage, adduce facts to establish by a preponderance of the evidence their standing to challenge the regulatory provision in issue. Specifically, plaintiffs must adduce facts at summary judgment, consistent with Rule 56(e), Fed. R. Civ. P., establishing that one or more of their members was precluded from bidding on a federal mapping contract that was procured by non-QBS procedures as allowed by the Brooks Act, the challenged regulatory provision, and the state law where the procurement occurred. The members so affected and the contracts involved must be specifically identified. Failure to do so will result in dismissal.[7]

Two further attacks on the sufficiency of the standing allegations must be addressed. First, the government argues that the standing allegations are insufficient because the Brooks Act's incorporation of state law definitions of engineering services render impossible any injury in fact claimed by plaintiffs. According to the government, this conclusion follows from the fact

---

[7] District courts may, of course, elect to resolve standing once and for all at the threshold stage, taking whatever steps may be necessary to do so, including, if necessary, allowing discovery or holding an evidentiary hearing. Yet where, as here, discovery may be necessary to litigate standing, but not to litigate the merits, it is appropriate to allow a brief period for discovery and then proceed to consider at summary judgment both standing and, if appropriate, the merits. Additionally, considering both issues at the summary judgment phase may be helpful given that further factual development relating to standing may shed light on the merits in the event it is appropriate to reach the merits.

that the Brooks Act amendment mandates that when state law[8] defines a particular service as an "architectural or engineering" service and requires that it be performed by a licensed surveyor, federal law follows suit and also defines that service as "architectural or engineering," and thus requires that the service be procured via QBS. *See* 40 U.S.C. § 1102(2)(A) and § 1103(a). The flaw in the government's argument is the assumption that all states require that all mapping services be performed by persons licensed or registered in the state. The current record does not support this assumption. To the contrary, plaintiff's general allegations of injury suggest that there is a subset of mapping services that are not "architectural or engineering services," as defined in the Act, and that some states allow these mapping services to be performed by unlicensed or unregistered persons. Thus, there exists the possibility that a surveyor licensed in a QBS-only state might be precluded by the law of that state from bidding competitively for a federal mapping services contract in a state that does not require those services to be performed by a licensed, registered, or certified person. Plaintiffs must demonstrate at summary judgment that this possibility is a reality.

Second, the government argues that the complaint's standing allegations are insufficient because federal law preempts any state ethics codes prohibiting competitive bidding, rendering injury in fact an impossibility. This argument fails because neither the Brooks Act nor the

---

[8] The law of the state where the contract is procured is the law incorporated by the Brooks Act. Neither the statute nor the regulatory provision states this in explicit terms, but it is the most natural inference from the statutory text. 40 U.S.C. § 1102(2)(A) states that architectural and engineering services includes "professional services of an architectural or engineering nature, as defined by state law, that are required to be performed by a person licensed, registered, or certified to provide the services described . . .". The most natural reading of this provision is that the state whose law defines architectural and engineering services is the same as that state that does the licensing.

10

challenged regulatory provision preempt any state ethical code.[9]

At issue here is "obstacle preemption", which operates when state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Geier v. Honda*, 529 U.S. 861, 883-886 (2000); *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595-96 (4th Cir. 2005). In other words, in obstacle preemption cases federal law does not completely occupy a field of law,[10] nor does state law require an act that federal law forbids (or vice-versa),[11] but state law instead impedes some policy or purpose of a federal statute or regulation.[12] Thus, the obstacle preemption inquiry here focuses on (i) whether the state ethics codes impede or obstruct the purposes of the Brooks Act or

---

[9] In connection with its preemption argument, the government also argues that the interpretive canon that statutes should be construed to avoid difficult constitutional issues requires that state ethics codes be construed as inapplicable to federal procurement. *See e.g. Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). This argument is meritless; the canon has no application here. In this case, there is no difficult constitutional issue to avoid; if the Brooks Act and the state ethics codes actually conflict, the Supremacy Clause clearly requires preemption. US Const. Art. VI, cl.2. ("The laws of the United States . . . shall be the supreme law of the land . . . any thing in the constitution or laws of any state to the contrary notwithstanding.").

[10] This type of preemption is typically referred to as field preemption. *See e.g. Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986) (citing *Rice v. Santa Fe Elevator Corp*, 331 U.S. 218 (1947)) (recognizing that Congress may legislate so comprehensively as to leave no room for states to supplement federal law).

[11] This type of preemption is a species of conflict preemption known as "physical impossibility" preemption. *See Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 143 (1963) (*dictum*). *See generally* Nelson, *Preemption*, 86 Va. L. Rev. 225, 228-29 (2000) (taxonomy of varieties of preemption, noting both physical impossibility preemption and obstacle preemption as species of conflict preemption.)

[12] *See e.g. Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Geier v. Honda*, 529 U.S. 861, 883-886 (2000) (holding that federal regulations may preempt state law, and that the promulgating agency need not express a preemptive intent with greater clarity than would be required of Congress). *See generally* Nelson, *Preemption*, *supra* note 11 at 228-29.

11

the challenged regulatory provision, and (ii) whether Congress intended to displace state law in these circumstances. The second inquiry is necessary because obstacle preemption, like other forms of preemption, is "fundamentally a question of congressional intent." *See English v. General Electric*, 496 U.S. 72, 78-79 (1990).

When these principles are applied here, it is readily apparent that obstacle preemption does not operate, as the Brooks Act's express incorporation of state law makes pellucidly clear Congress' intent *not* to preempt any state's law requiring QBS bidding for mapping services. Manifestly, Congress' intent was not to preempt state law regulating surveyor conduct, but rather to follow such law with respect to contracting for those mapping services the state requires to be performed by licensed, registered, or certified persons. In short, there can be no federal preemption of state law where, as here, Congress makes clear its intent to incorporate state law, not preempt it.

*United States v. Georgia Pub. Serv. Comm'n.*, 371 U.S. 285 (1963), the case chiefly relied upon by the government in support of its preemption argument, is not to the contrary; it is easily distinguished and the contrast between that case and this one confirms the absence of preemption here. There, the Supreme Court found obstacle preemption where state law set fixed per-family rates for the carriage of certain household goods, while federal law required negotiated rates for shipment of those goods for government employees. *Id.* at 292-93. Obviously, the state's statutorily-fixed rates were flatly incompatible with the federal law mandating negotiated rates. No such incompatibility exists here; to the contrary, the federal and state schemes are compatible. The Brooks Act allows competitive bidding for certain mapping services only where the state does not require otherwise.

12

The only remaining challenge to standing is the government's assertion that plaintiffs' standing allegations are false. This challenge, as noted *supra*, must await resolution at summary judgment.

To summarize, for one of plaintiffs' members to suffer injury in fact he must be plausibly threatened with discipline by a state authority if he bids on a federal project procured by non-QBS methods, and the law of the state where he seeks to bid must not define the services sought as "architectural or engineering" such that they must be performed by a licensed professional. Since the facts pled may be construed as encompassing this possibility, they are not insufficient at this stage, but one of plaintiffs' members meeting the requisite criteria must be produced to avoid summary judgment on Article III standing.

*2. Causation and Redressability*

The government only half-heartedly contests causation and redressability. This is not surprising, as both are plainly present here. If plaintiffs succeed in establishing injury in fact, it will be because they have identified a specific member or members who were precluded by state ethics laws from bidding for a federal mapping contract procured through competitive bidding pursuant to the challenged regulatory provision. Given this, it is clear that both the state ethics laws and the challenged provision contribute to this result, as both are necessary causes; neither, by itself, is a sufficient cause of the injury in fact. For standing to fail for lack of causation, the injury must be attributable to a *sufficient* cause not before the Court.[13] Since no such sufficient

---

[13] *See e.g. Allen v. Wright*, 468 U.S. 737, 757 (1984) (injury attributable to "independent action of some third party not before the Court") (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976)); *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211-1212 (5th Cir. 1982) (would-be movie viewer lacks standing in that capacity to challenge city regulation of adult theaters because record disclosed no third party willing to build a theater governed by the

cause appears here, causation for standing purposes is present.

Further, any injury resulting from the purported inconsistency of the challenged regulatory provision and the Brooks Act would clearly be redressable by a favorable court order setting aside the regulatory provision and ordering the FAR Council to promulgate a regulation consistent with the Brooks Act.

In sum, there is no doubt that the challenged regulatory provision was a legally sufficient, but not sole cause of any injury in fact suffered by some subset of plaintiffs' members. It is equally clear that such injury would be redressable by an order setting aside the challenged regulatory provision. Therefore, constitutional standing is adequately alleged.

*B. Prudential Standing*

The government also contends that plaintiffs lack so-called "prudential" standing, the species of standing that in this case derives from 5 U.S.C. § 702, the APA's judicial review provision, which provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Courts construing this judicial review provision have developed the "zone of interests" test as an analytical tool to determine whether a particular plaintiff comes within the ambit of § 702. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987). In essence, the zone of interests test is an aid to determining whether a plaintiff is a

---

regulation); 13 Wright et al., *Federal Practice and Procedure* § 3531.5 ("Causation makes its most useful contribution standing analysis in circumstances [where, a]lthough an injury has been shown, it can be traced to independent *and sufficient* cause in sources other than the matters of complained of by plaintiff.") (emphasis added; internal citations omitted). *See also Frank Kasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230, 234-236 (4th Cir. 2005) (discussing causation and actions of third parties).

"person adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.; see also* Siegel, *Zone of Interests*, 92 Geo. L.J. 317, 341-47 (2004). The test requires, at the broadest level, that a plaintiff demonstrate that the interest he seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Nat'l Credit Union Admin. v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 492 (1998) (citing *Ass'n of Data Processing Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). This requires a two part inquiry: (i) first, determining what interests the statute arguably protects, and (ii) then determining whether the interests plaintiffs assert as affected by the agency action are among them. *See Pye v. United States*, 269 F.3d 459, 469-470 (4th Cir. 2001) (internal citations omitted).

As to the first prong – identifying the protected interests – a plaintiff need not demonstrate that Congress specifically intended the statute to benefit him or a class of which he is a member. *Nat'l Credit Union Admin.*, 522 U.S. 479, 492 (1998) (citing *Data Processing*, 397 U.S. 150, 153 (1970)). In other words, plaintiffs here need not show that Congress specifically intended a provision of the Brooks Act[14] to benefit them, although such a showing would necessarily satisfy the zone of interests test. Instead, to pass muster under this first prong of the zone of interests test, plaintiffs must merely show that their interests are among those "arguably

---

[14] Caselaw makes clear that the zone of interests inquiry must be resolved not by reference to the purpose of the statute as a whole, but instead by reference to the particular provision of law upon which plaintiff seeks redress. *Taubman Realty Group v. Mineta*, 320 F.3d 475, 480 (2003); *Bennett v. Spear*, 520 U.S. 154, 175-176 (1997). In this case, that provision would be the Brooks Act definition of "architectural and engineering services," 40 U.S.C. § 1102. However, that distinction makes no difference here, as the purpose of the statute's definitional provision in § 1102 is merely to clarify the substantive requirements in §§ 1103-4 regarding what services must be procured via QBS. The purpose of the definitional section is the same as that of the substantive sections.

15

. . . to be protected" by the statute. *Id.* But the "zone of interests" does not extend to every potential plaintiff who suffers an injury in fact, otherwise the test would be superfluous to the constitutional standing requirement of injury in fact. Neither is the zone of interests test satisfied if a plaintiff is a mere "incidental beneficiary" of the statute, *i.e.*, one whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *See e.g. Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987). Yet, the mere fact plaintiffs are more than incidental beneficiaries does not guarantee that they will satisfy the zone of interests test. *TAP Pharmaceuticals v. Dept. of Health and Human Services*, 163 F.3d 199, 206 (4th Cir. 1998). In short, incidental beneficiaries are never within a statute's zone of interests, while intended beneficiaries always are. Beyond the incidental and intentional beneficiary categories, however, there is little guidance for defining a statute's zone of interests. *See TAP Pharmaceuticals*, 163 F.3d at 207.[15] Thus, the prudential standing inquiry in this case properly focuses on whether plaintiffs may be said to be intended beneficiaries of the Brooks Act, as amended, or alternatively

---

[15] While the Fourth Circuit's decision in *TAP Pharmaceuticals* provides more specific guidance for some cases, it is distinguishable, as that case does not address, or appear applicable, to a challenge to government procurement regulations. *TAP Pharmaceuticals* identified four (and only four) classes of plaintiffs who can challenge a regulation for commercial reasons: (i) persons or entities directly regulated thereby, (ii) their commercial competitors, (iii) others asserting commercial interests identical to the regulated entity's, or (iv) persons asserting commercial interests identical to those of the regulated entity's competitors. *Id.* at 208. It is apparent that no government contractor would ever have standing to challenge a procurement regulation under *TAP Pharmaceuticals* because such a contractor would not fall within any of the four categories. Since contractors are the only entities likely to challenge a procurement regulation, it appears that no one would have standing challenge such a regulation at all. This result should not be lightly embraced, since agency action is presumptively reviewable, and no contrary intent is apparent from the Brooks Act's text. *Cf. Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (agency action is presumptively reviewable under APA).

they may still fall within the zone of interests if the statute does in fact benefit them, or if their interests align with those protected by the statute, to such a degree that one can readily ascribe to Congress an intent that the plaintiffs be permitted to enforce the statute.[16]  A "salient consideration" in this respect is "whether the challenger's interests are such that they in practice can be expected to police the interests the statute protects."  *See Amgen v. Smith*, 357 F.3d 103, 109-10 (D.C. Cir. 2004) (discussing *TAP Pharmaceuticals* and finding prudential standing where the challenger's interests were "sufficiently aligned" with statutory purposes.).

Plaintiffs satisfy this test because they are arguably intended beneficiaries, or at least beneficiaries in fact, of the Brooks Act, as amended.  Thus, even assuming plaintiffs are not intended beneficiaries of the Act,[17] it is still clear that the Act in fact benefits them in more than an incidental way because it requires procurement to occur in a manner consistent with industry practice – that is, via QBS – in most circumstances.  Moreover, plaintiffs are well-positioned to monitor administration of the Brooks Act to ensure that such administration is consistent with the terms of the Act and its purposes.  This confirms that plaintiffs are appropriately viewed as

---

[16] One scholar usefully described the circumstances where this might occur as follows: "Congress, in passing a statute, may recognize that although the purpose (at least the ostensible, public-spirited purpose) of the statute is not to benefit a particular party, the statute will in fact have the effect of benefitting that party to such an extent that the party will have a substantial interest in the statute's enforcement.  Congress may intend that the party serve as an enforcer of the statute."  Siegel, *Zone of Interests*, 92 Geo. L.J. 317, 354 (2004).

[17] The nominal purpose of the Brooks Act is to protect the federal fisc by securing architectural and engineering services for the government on a cost-effective basis, that is, to prevent contractors from compromising quality in an effort to underbid competitors.  *See* S. Rep. 92-719 (1972), *reprinted in* 1972 U.S.S.C.A.N. 4767.  *See also id.* at 4769.  If this were the sole purpose of the Act, plaintiffs are not intended beneficiaries.  Yet the legislative history also recognizes the anti-competitive nature of the provision, which suggests plaintiffs may be intended beneficiaries.  *Id.* at 4770.

within the zone of interests Congress intended to protect in enacting the Brooks Act, as amended.

It is clear plaintiffs' asserted interests arguably fall within the zone of interests protected by the Brooks Act, thereby satisfying the first prong of the zone of interests test. The second prong is much more easily resolved. The agency action challenged, promulgation of the FAR Council regulation, clearly affects the plaintiffs' interests, because it mandates a departure from QBS procedures in some circumstances. Therefore, plaintiffs satisfy both prongs of the zone of interests test at this stage of the proceedings. Of course, like constitutional standing, the zone of interests analysis is open to reexamination at the summary judgment stage.

**IV.**

In conclusion, it appears that the plaintiffs have alleged sufficient facts to establish both constitutional and prudential standing. Therefore, the motion to dismiss must be denied. An appropriate Order has issued.

_____/s_____

Alexandria, Virginia
December 13, 2006

T. S. Ellis, III
United States District Judge