**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| MANGEMENT ASSOCIATION FOR     ) <br> PRIVATE PHOTOGRAMMETRIC        ) <br> SURVEYORS, et al.                         ) <br>                                       ) <br>         **Plaintiffs,**     ) <br>                                       ) <br>            **v.**     ) <br>                                       ) <br> **UNITED STATES OF AMERICA,**     ) <br>                                       ) <br>        **Defendant.**     ) <br>                                       ) | Civil Action No. 1:06cv378 |

**MEMORANDUM OPINION**

Plaintiffs in this APA[1] and declaratory judgment[2] action challenge as arbitrary and capricious the federal government's failure to initiate a new rulemaking and promulgate a new regulation in response to an amendment to the Brooks Act governing federal procurement of certain architectural and engineering (A-E) services.[3] The government's attack on plaintiffs' standing to mount this APA challenge could not be definitively resolved at the threshold, owing to an anemic record and the generous construction afforded complaints at the motion to dismiss

---

[1]The Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

[2] 28 U.S.C. § 2201.

[3] A previous Memorandum Opinion addressing the standing issue at the threshold stage mistakenly noted that plaintiffs' challenge was to a specific regulation. *See Management Ass'n for Private Photogrammetric Surveyors v. United States*, 467 F. Supp. 2d 596 (E.D.Va. 2006) (Memorandum Opinion denying motion to dismiss) ("*MAPPS I*"). Instead, plaintiff's complaint challenges not a regulation, but instead the agency's failure to initiate a new rulemaking, perhaps because couching the claim in this manner circumvents the six year limitations period applicable to a challenge to a specific regulation. *See* 28 U.S.C. § 2401. The error did not affect the substantive analysis in the previous opinion.

stage.[4]  Now, on a more complete record, standing must be finally addressed and resolved before the merits may be engaged.

For the reasons stated herein, the government is entitled to summary judgment, as plaintiffs lack the requisite standing to maintain this action.

## I.[5]

At issue on cross motions for summary judgment are both plaintiffs' standing to bring this challenge and the merits of the challenge itself.  The essentially undisputed facts relating to standing and the merits are set forth here.  The first subsection describes the statutory and regulatory history; the next subsection describes the evidence submitted in support of standing, and the final subsection briefly reviews the procedural history.

*A. Statutory and Regulatory History*

The Brooks Act, enacted in 1972, governs the federal government's method of selecting contractors to provide A-E services.  *See* 40 U.S.C. § 1101-04.  Under the Act, federal agencies must "negotiate contracts for architectural and engineering services on the basis of demonstrated competence and qualification for the type of professional services required and at a fair and reasonable price." 40 U.S.C. § 1101.  In other words, the Brooks Act does not allow federal agencies to award A-E contracts on the familiar lowest-bidder basis, but rather mandates a

---

[4] *See MAPPS I*, 467 F. Supp. 2d at 601.

[5] When evaluating a motion for summary judgment, all factual disputes are resolved in the light most favorable to the non-movant, and all reasonable inferences are drawn in the non-movant's favor.  *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 269 n.3 (4th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)).  The movant prevails only if the facts, so taken, establish that no genuinely disputed issue of material fact exists and that the the movant is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.

procedure for procuring these services, known as qualification-based selection (QBS), in which agencies (i) solicit statements of qualifications from licensed A-E service providers, (ii) select the most qualified respondent, and then (iii) attempt to negotiate a fair and reasonable price with the contractor.  *See* 40 U.S.C. § 1103-04.  Thus, whether a service must be procured via QBS depends on whether it is an "architectural and engineering service" within the meaning of the Brooks Act.

   The original 1972 Brooks Act language defining A-E services stated that

> the term "architectural and engineering services" includes those professional services of an architectural or engineering nature as well as incidental services that members of those professions and those in their employ may logically or justifiably perform.

 40 U.S.C. § 541 (1972); *see also* Pub. L. No. 92-582, § 901(3), 86 Stat. 1278 (1972).  Legislative history indicates that Congress understood the Act to focus on obtaining A-E services "in carrying out federal construction and related programs."  S. Rep. 92-1219 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4767.  In other words, the enacting Congress' understanding of the Brooks Act was that it addressed the procurement of A-E services in connection with federal government construction projects.  *See, e.g., id.* at 4772 (noting that "costs for [A-E services] in the construction of a structure . . . represent a very small part of the total cost of construction, yet those services are basic and essential to the quality of the construction... .").

   The statutory definition of A-E services remained unchanged for sixteen years.  Then, in 1988, the Act was amended to define A-E services, in pertinent part, as follows:

> (A) professional services of an architectural or engineering nature, as defined by state law, if applicable, that are required to be performed or approved by a person licensed, registered, or certified to provide the services described in this paragraph; . . .

>   (C) other professional services of an architectural or engineering nature, or incidental services, which members of the architectural and engineering professional (and individuals in their employ) may logically or justifiably perform, including . . . surveying and mapping... .

40 U.S.C. § 1102(2).  It is the scope and content of this language and the regulatory response to it that is at the heart of the parties' dispute in this case.  Plaintiffs contend that a new regulation must be promulgated that is consistent with the 1988 amendment and hence would require all mapping contracts to be procured solely via QBS.  Defendant responds that the current regulatory regime, which allows some mapping contracts to be procured via non-QBS procedures, is fully consistent with the 1988 amendment.

Nothing in the legislative history of the 1988 amendment suggests that the phrase "surveying and mapping" was intended to broaden the Brooks Act's focus from construction on federal lands to the procurement of mapping services unrelated to construction on real property. *See* 134 Cong. Rec. H10606-03 (daily ed. Oct. 20, 1988); 1988 WL 178065.  Indeed, notwithstanding the apparent breadth of the term "mapping," the legislative history confirms that the Brooks Act amendment was not intended to expand the range of services required to be performed by QBS.  *Id.*  Instead, the amendment's drafters noted that QBS need not be used to procure, for example, mappings services of the sort typically procured by the Defense Mapping Agency, as those maps are unrelated to traditional A-E services.  *Id.*  It is also worth noting that the record unambiguously reflects that the provision of "mapping" services in the modern marketplace includes a much broader scope of work than the traditional mapping work of land surveyors.  *See* Affidavit of Douglas Richardson, filed as Exhibit A to Brief *Amicus Curiae* of Association of American Geographers *et al.*

4

Following the passage of the 1988 amendment, the FAR Council – the administrative body[6] charged with administering and overseeing the application of the Federal Acquisition Regulation, 48 C.F.R. § 1.000 *et seq.* – undertook in 1991 to clarify by regulation precisely what was included in A-E services. The first three subsections of the regulation – found at 48 C.F.R. § 36.601-4(a)(1)-(4) – essentially parallel the statutory language and have remained substantially unchanged since the rule was first promulgated in 1991. Yet subsection (a)(4), which provides additional guidance about when "surveying and mapping" must be procured using QBS, has changed twice. The original language of subsection (a)(4) was drawn nearly word for word from a colloquy between Rep. Brooks, author of the Brooks Act and its 1988 amendments, and another Representative during debate on the 1988 amendments. *See* 134 Cong. Rec. H10606-03 (daily ed. Oct. 20, 1988), 1988 WL 178065. Thus, the original version of subsection (a)(4) read as follows:

> Surveying is considered to be an architectural and engineering service and shall be procured pursuant to 36.601 from registered surveyors or architects and engineers. Mapping associated with the research, planning, development, design, construction, or alteration of real property is considered to be an architectural and engineering service and is to be procured pursuant to 36.601. However, mapping services, such as those procured by the Defense Mapping Agency, that are not connected to traditionally understood or accepted architectural and engineering activities, are not incidental to such architectural and engineering activities or have not in themselves traditionally been considered architectural and engineering services shall be procured pursuant to provisions in parts 13, 14, and 15.

48 C.F.R. § 36.601-4(a)(4) (1991).

The first change to the regulation occurred in 1998, when the FAR Council substituted

---

[6] The FAR Council is an administrative body composed of the Secretary of Defense, the Administrator of National Aeronautics and Space, the Administrator of General Services, and the Administrator of the Office of Federal Procurement Policy. 41 U.S.C. § 421(b).

"National Imagery and Mapping Agency" (NIMA) for "Defense Mapping Agency" to reflect the agency's name change. The second revision occurred in 1999, when the reference to NIMA was removed as an example of the type of mapping services that need not be procured via QBS. The current provision, as promulgated in 1999, provides in pertinent part as follows:

> (a) Contracting officers should consider the following services to be "architect-engineer services" subject to the procedures of this subpart:
> (1) Professional services of an architectural or engineering nature, as defined by applicable state law, which the state law requires to be performed by a registered architect or engineer . . .
> (4) Professional surveying and mapping services on [sic] an architectural or engineering nature. [Surveying is always considered an A-E service.] Mapping associated with the research, planning, development, design, construction, or alteration of real property is considered to be an architectural and engineering service and is to be procured pursuant to 36.601. However, mapping services that are not connected to traditionally understood or accepted architectural and engineering activities, are not incidental to such architectural and engineering activities or have not in themselves traditionally been considered architectural and engineering services shall be procured pursuant to provisions in parts 13, 14, and 15.

48 C.F.R. § 36.601-4 (1999). This change was precipitated by a defense appropriations bill providing that none of the appropriated funds for 1999 could be used by NIMA for mapping contracts unless such contracts were procured via QBS. *See* Pub. L. 105-262 § 8101, 112 Stat. 2279, 2320 (1998). While the appropriations bill itself only affected money spent in 1999, the legislative history of the bill stated that Congress intended for the FAR Council to "strike and revise" the final sentence of 48 C.F.R. § 36.601-4(a)(4) and replace it with language requiring a much broader definition of "surveying and mapping" that must be procured via QBS. *See* H.R. Rep. No. 105-746 at 165 (1998) (Conference Report). Specifically, the conferees directed the FAR Council to define "surveying and mapping" in the disputed regulatory provision to mean

> contracts and subcontracts for services for Federal agencies for collecting, storing,

6

> retrieving, or disseminating graphical or digital data depicting natural or man made physical features, phenomena and boundaries of the earth and any information related thereto, including but not limited to surveys, maps, charts, remote sensing data and images and aerial photographic services.

*Id.* Notwithstanding this legislative history, the FAR Council did not change the rule in this manner. Plaintiffs petitioned the Administrator of the Office of Federal Procurement Policy – a member of the FAR Council – to reconsider the 1991 regulation, but OFPP declined to do so.

On February 21, 2002, with a new Administrator of Federal Procurement Policy in office, plaintiffs again requested that 48 C.F.R. § 36.601-4(a)(4) be revised. In response, the FAR Council solicited public comments on whether it should initiate a new rulemaking to revise the disputed regulatory provision. 69 Fed. Reg. 13499 (Mar. 23, 2004). The majority of submitted comments opposed a change. The FAR Council addressed the arguments of those commenters supporting a new rulemaking in a notice dated April 19, 2005. *See* 70 Fed. Reg. 20,329, 20,330-33 (Apr. 19, 2005). Ultimately, the FAR Council concluded a new rulemaking was not warranted. *Id.* Accordingly, plaintiffs filed this suit challenging the FAR Council's decision not to initiate a new rulemaking to revise 48 C.F.R. § 36.601-4(a)(4).

*B. Plaintiff and the Individual Surveyor-Affiants*

There are four named plaintiffs in this action: (i) Management Association for Private Photogrammetric Surveyors (MAPPS), (ii) Council on Federal Procurement of Architectural and Engineering Services, (iii) National Society of Professional Engineers, and (iv) American Society of Civil Engineers. Yet because no evidence appears in the record concerning the membership of, or any injury to, any plaintiff other than MAPPS, only MAPPS' standing deserves scrutiny and the other plaintiffs must be dismissed for lack of standing.

MAPPS, as its name indicates, is a trade association of mappers and surveyors, or more precisely, of mapping and surveying firms. MAPPS has no individual members, only firm members. In support of its standing argument, MAPPS has submitted affidavits from three individual surveyors. These surveyors, employed by MAPPS member firms, contend that they were unable to compete for two particular government contracts because those contracts were not procured via QBS and state ethical rules prohibited them participating in any other type of solicitations.

These two contracts merit further description. The first is the Environmental Protection Agency's Solicitation PR-NC-04-10500 (hereinafter the "EPA solicitation"), which issued from the EPA's Raleigh office and sought "spatial data support services in a variety of states, including North and South Carolina." This contract was procured not via QBS, but instead by FAR Part 15 Negotiated Acquisition Procedures. Importantly, the record also unambiguously reflects that because of its scope, the EPA solicitation effectively required the services of a national firm, as the solicitation required (i) remote sensing services wherever they were needed across the United States and internationally, (ii) personnel in the Washington, DC area with a Top Secret/SCI security clearance, and (iii) a "multi-disciplinary" staff with skills including "the application of remote sensing technology to natural and cultural resources identification and mapping, as well as personnel with technical capabilities in image analysis, image processing, Geographic Information Systems, photogrammtery, Global Positioning Systems, and cartography." Indeed, only three companies responded to the EPA solicitation: Lockheed Martin (which was eventually awarded the contract), General Dynamics, and Computer Services Corporation.

The second government contract at issue is United States Department of Agriculture Solicitation USDA-NAIP-3-04 (the "USDA solicitation"). This solicitation sought aerial photograph and digital imagery services across all forty eight states in the continental United States, and like the EPA solicitation, procurement was pursuant to FAR Part 15 Negotiated Acquisition Procedures, not QBS. In contrast to the EPA soliciation, seventeen companies, many of them smaller or moderate sized firms, responded to the USDA solicitation, and specified the states in which they desired work under the contract. The contract was awarded in April 2004, and the work was divided among numerous firms.

With this background in mind, a description of the proffered affidavits is in order. First, one Patrick Olson avers that he is employed by Aero-Metrics, Inc., a MAPPS member, and that he is licensed as a surveyor first in Wisconsin, and also in North and South Carolina because the respective professional regulatory boards in the latter two states informed him that he must be licensed in those states to practice photogrammetry there. Olson further states that he was "barred from submitting a response" to the EPA solicitation because he understood the rules of professional responsibility in North and South Carolina to prohibit surveyor responses to solicitations for services unless a QBS procedure was utilized, and he "believe[s] it is improper for [him] to respond to non-QBS solicitations for professional services that includes work in North Carolina or South Carolina." Affiant Marvin Miller likewise avers, in language drawn almost word-for-word from the Olson affidavit, that he is a licensed surveyor in South Carolina and that for the same reasons, he could not respond to the EPA solicitation. Finally, Mickey Blackwell avers that he is an employee of Aerial Data Services, a MAPPS member firm, and a licensed surveyor in Oklahoma, a state which he contends also prohibits responses to non-QBS

9

solicitations. Blackwell further states that he was barred from submitting a response to the USDA solicitation for this reason.

Although the affiants' employers, Aerial Data Services and Aero-Metrics, were not chosen as contractors for the above-mentioned EPA and USDA solicitations, it bears mention that Aerial Data was chosen as a subcontractor by one or more of the prime contractors who won the USDA solicitation, and that Aero-Metrics did in fact bid for work unsuccessfully under the USDA solicitation. In a second affidavit submitted with MAPPS's reply brief, Blackwell further avers that the services provided by Aerial Data did not include photogrammetric or surveying work subject to regulation by state licensing boards, but merely involved providing the prime contractor with the services of an airplane, a pilot, and a photographer. Olson further avers that Aero-Metrics only bid for work in Wisconsin, Illinois, and Indiana, states which, he claims, do not prohibit non-QBS bidding by surveyors.

*3. Procedural History*

MAPPS' standing to assert this challenge to agency inaction was the subject of a threshold motion to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P. In this motion, the government argued both that MAPPS's factual allegations relating to standing were false, and that, in any event, those allegations were legally insufficient to support standing. The latter argument was rejected; the complaint's standing allegations were held sufficient to support jurisdiction at the threshold stage given the generous standard applicable at that stage of the case. *See MAPPS I*, 467 F. Supp. 2d 596. Yet, as the Memorandum Opinion recognized, this decision did not finally dispose of the standing issue; instead, the issue would be revisited on summary judgment following discovery. The parties thereafter completed jurisdictional discovery and

have filed cross motions for summary judgment on both standing and the merits. Additionally, a brief *amicus curiae* was filed on behalf of those mappers not represented by the plaintiff associations who would be harmed in the event MAPPS' efforts succeeded. As the issues have now been fully briefed and argued, the motions are now ripe for disposition.

## II.

The principles governing summary judgment are as familiar as they are well-settled. Summary judgment must be granted where the record shows "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, Rule 56(c), Fed. R. Civ. P. Once this showing is made, the party opposing summary judgment must demonstrate that a triable issue of fact exists, that is, that a reasonable factfinder could find in his favor on the disputed issue. Rule 56(e), Fed. R. Civ. P; *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). And where, as here, cross-motions for summary judgment are at issue, each motion is considered separately on its merits. *Bacon v. City of Richmond*, 475 F.3d 633, 637-38 (4th Cir. 2007).

## III.

If jurisdiction is properly viewed as the power to adjudicate, then standing may be appropriately characterized as a requirement for invoking jurisdiction. Absent standing, a party cannot invoke a court's jurisdiction. *See, e.g., Allen v. Wright*, 468 U.S. 737, 750-51 (1984). Standing, therefore, is jurisdictional.

Standing comes in two varieties: constitutional and prudential. *See Allen*, 468 U.S. at 750-51. Constitutional standing involves a familiar but elusive three-pronged test, described *infra*. Prudential standing involves, *inter alia*, determining whether a plaintiff falls within the "zone of interests" protected by a statute, along with a host of other sub-constitutional limitations

on jurisdiction. *See Allen*, 468 U.S. at 750-51; *MAPPS I*, 467 F. Supp. 2d at 605-07. Only constitutional standing is at issue here, as prudential standing was resolved in favor of MAPPS at the threshold and was not raised on summary judgment. *See MAPPS I*, 467 F. Supp. 2d at 605-07.

To demonstrate Article III standing, MAPPS (i) must show a "concrete," "particularized," and "actual" (or "imminent") injury in fact. That injury (ii) must be fairly traceable to defendant's conduct and (iii) must be likely to be redressed by a favorable ruling. *Lujan v. Defendners of Wildlife*, 504 U.S. 555, 560-61 (1992). And MAPPS, as the party invoking federal jurisdiction, bears the burden of proving standing. *See Miller v. Brown*, 462 F.2d 312, 316 (4th Cir. 2006) (citing *FW/PBS, Inc.v. Dallas*, 493 U.S. 215, 231 (1990)). Further, since standing is an essential element of any federal case, MAPPS bears the burden of establishing standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Accordingly, to survive summary judgment on standing grounds, MAPPS must set forth by affidavit or otherwise specific facts sufficient to prove its standing. *See* Rule 56(e), Fed. R. Civ. P.; *Lujan*, 504 U.S. at 561.

These settled principles are necessary but not sufficient to resolve MAPPS' standing because MAPPS relies not on any injury in fact that it has suffered, but rather on injuries suffered by employees of its member firms. Given this, MAPPS must first establish associational standing – that is, its standing to assert injuries of its member firms – and then, because the employees of the member firms allegedly suffered the injury in fact, it must also establish third party standing on behalf of its member firms to assert the rights of their employees.

But before considering whether third party and associational standing exist here, it is

necessary to consider whether it is appropriate to combine or stack third party and associational standing in this way – that is, whether an association may, under any circumstances, assert the putative injuries in fact of its members' employees. The Supreme Court has never endorsed such a combination, and as one commentator has noted, "the combination of associational and third-party standing . . . relies on an uncertain interpretation of past Supreme Court decisions" and may sometimes "involve a relationship too attenuated to meet jurisprudential requirements." *See* T. Flint, Comment, *A New Brand of Representational Standing*, 70 U. Chi. L. Rev. 1037, 1038 (2003). Yet ultimately, several circuits have permitted such "derivative standing," apparently concluding, like the aforementioned commentator, that the requirements of third party and associational standing, faithfully applied, are sufficiently rigorous to ensure the concrete adversity of interests necessary for an Article III "case." *See, e.g., Pennsylvania Psychiatric Society v. Green Spring Health* Services, 280 F.3d 278, 289-293 (3rd Cir. 2002) (plaintiff could assert injury to member psychiatrists' patients); *Ohio Ass'n of Independent Schools v. Goff*, 92 F.3d 419, 421-22 (6th Cir. 1996) (plaintiff could assert rights of parents whose children attended member schools); *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 107-10 (1st Cir. 2006) (plaintiff could assert rights of members' employees); *see also* Flint, 70 U.Chi. L. Rev. at 1037 n.6 (citing other cases). One Third Circuit judge, writing in dissent, disagrees, asserting that associational and third-party standing should not be "stacked.". *See Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, 280 F.3d 278, 294-296 (3rd Cir. 2002) (Nygaard, J., dissenting). The better view seems to be that of the Third Circuit majority and the several courts which have accepted the notion that associational and third party standing can be "stacked" to create "derivative standing," but that in these circumstances, a court must analyze

both the plaintiff's standing to assert the injuries of its members and the members' standing to assert the rights of the pertinent third parties.

Accordingly, the analysis must consider (i) whether MAPPS may assert any injury suffered by its member firms under *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000), and (ii) whether the member firms may assert the putative injuries of their surveyor employees under *Singleton v. Wulff*, 428 U.S. 106, 113-16 (1976). To establish associational standing under *Laidlaw*, MAPPS must show (i) that some of its member firms would have standing to sue, (ii) that the interests at stake are germane to the MAPPS's purposes, and (iii) that neither the claim asserted nor relief requested requires the participation of MAPPS's members. *See Laidlaw*, 528 U.S. at 181. And, to establish third party standing under *Singleton*, MAPPS must show that (i) the member firms have suffered an injury in fact, (ii) the member firms are nearly as effective a proponent of their employees' rights as the employees themselves and (iii) there is some obstacle to the employees asserting their own rights. *See Singleton*, 428 U.S. at 113-16; *see also Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800, 809-10 (11th Cir. 1993); *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 107-10 (1st Cir. 2006). As is apparent, a showing of injury in fact to MAPPS' member firms or to the surveyor employees of those firms is common to both associational and third party standing. The standing analysis, therefore, appropriately focuses first on whether MAPPS' affidavits succeed in establishing injury in fact to MAPPS' member firms or to the surveyor employees of those firms. Absent such a showing in the affidavits, MAPPS standing claim would fail even if it satisfied the other requirements.

As *MAPPS I* notes, individual employee surveyors suffered injury only if it is shown that

they were unable to compete for certain government contracts solely because the current regulatory scheme permitted those contracts to be procured via non-QBS solicitations, to which these surveyors were prohibited to respond. *See MAPPS I*, 467 F. Supp. 2d at 601-04. The government argues that such an injury is not possible because the Act and the regulations make clear that when state law requires QBS, so does the Brooks Act.[7] While this incorporation of state law undoubtedly reduces the possibility of injury to the surveyor employees, it does not wholly eliminate the possibility of such an injury. As *MAPPS I* notes, injury would be possible, despite this incorporation of state law, if a surveyor licensed in a state that prohibits responses to non-QBS solicitations was prohibited by the licensing state's law from bidding competitively on a federal mapping services contract in a state that did not require those services to be performed by a licensed person. *See MAPPS I*, 467 F. Supp. 2d at 603. This possibility was sufficient at the pleading stage, because on the facts pled in the complaint, such an injured surveyor employee of a MAPPS member firm might exist. Yet, at the summary judgment stage, such a surveyor must be specifically identified, along with the pertinent federal contracts, state laws, and any actual or threatened disciplinary proceedings which prevented him from bidding. A review of the summary judgment record identifies no such surveyor employee and hence the summary judgment record does not support standing.[8]

---

[7] This conclusion allegedly follows because 48 C.F.R. § 36.601-4(a)(1) requires QBS procurement of services required by state law to be performed by a registered architect or engineer.

[8] The affidavits could also be construed as alleging an injury to the affiants' employers, that is, to MAPPS member firms Aero-Metrics and Aerial Data. The affidavits also fail to aver an injury to those firms, for the same reasons that they fail to aver an injury to the individual surveyors. *See infra*.

It is apparent from the record that the individual surveyors, and their small to mid-sized firms, were not plausible candidates for the EPA contract given the large scope of that contract. The EPA contract effectively required a large public company, including, *inter alia*, staff in the Washington, DC area with Top Secret/SCI security clearances.  The government correctly contends that standing cannot be based on inability to compete for a contract for which the would-be competitor is unqualified.  *See Albequerque Indian Rights v. Lujan*, 930 F.2d 49, 56 (D.C. Cir. 1991) (no "basis for standing if there is no realistic possibility of those competing for a position to receive it once the supposed illegality is corrected"); *Ranger Cellular v. FCC*, 348 F.3d 1044, 1050 (D.C. Cir. 2003) (same).  Thus, it follows that neither the surveyor employees nor the firms were injured in fact with respect to the EPA contract because they were not qualified to bid for it.  Accordingly, the putative injuries to Olson and Miller are not cognizable, as their affidavits only indicate that they were deterred from bidding on the EPA contract, not the USDA contract.  Only the Blackwell affidavit, which relates to the USDA contract, remains as a potential basis for establishing injury in fact to MAPPS' member firms or their surveyor employees.

The USDA contract, in contrast to the EPA contract, appears to have been one for which the MAPPS member firms would have been eligible to bid.  The record reflects that numerous mid-sized photogrammetry firms from across the nation were chosen as contractors for the USDA contract, and thus a bidder need not have been a company on the scale of a Lockheed Martin.  Yet notwithstanding that MAPPS member firms were not too small to bid on the USDA contract, it is apparent that the Blackwell affidavit falls short of establishing an injury in fact with respect to that contract.  In support of the claim of injury, Blackwell avers that "we [presumably

his firm, Aerial Data Service] were barred" from submitting a response to the USDA solicitation because, as Blackwell is a surveyor licensed in Oklahoma, "the legal and ethical prohibitions against responding to solicitations for my professional services based upon non-QBS procedures" deterred him from doing so.  Assuming, as is appropriate when considering the government's summary judgment motion, that Blackwell was indeed deterred from bidding on the USDA solicitation because he understood Oklahoma ethics laws to forbid it, this fact, by itself, does not establish an injury in fact.  As explained in *MAPPS I*, to show a qualifying injury, a firm or surveyor employee must show (i) that the state law where the procurement occurred did not require the services solicited to be performed by a licensed surveyor, and (ii) that the state of the surveyor-affiant's licensing would nonetheless discipline the surveyor for bidding on the contract.  *MAPPS I*, 467 F. Supp. 2d at 602-03.  A firm or surveyor employee who fails to make either showing fails to carry the standing burden – in the former case, because the disputed regulatory provision, by its own terms, would require QBS procurement in such a circumstance, and in the latter case, because nothing prohibits the surveyor from competing for the disputed contract.  Here, MAPPS has not made either showing in the Blackwell affidavit or elsewhere.  It has not provided authoritative constructions of the pertinent state laws establishing that the services solicited by the USDA need not be performed by a licensed person.  Nor has it made any showing at all that Oklahoma would discipline Blackwell or his firm for bidding on the USDA contract.[9]  To the contrary, MAPPS has cited no disciplinary proceedings, in Oklahoma or

---

[9] MAPPS argues that it is sufficient to show Blackwell's inability to compete by demonstrating that the services sought by the USDA were "surveying" as defined by state law, and that state law prohibits non-QBS bidding on them.  This is insufficient, because if the services sought by the USDA were required by Oklahoma law to be performed by a licensed architect or engineer, the disputed regulatory scheme itself would also require them to be

elsewhere, in which surveyors were disciplined for bidding on non-QBS solicitations, whether in their own state or elsewhere, and no such proceedings could be located. In these circumstances, it cannot be said that state law prevents land surveyors from bidding as they see fit.[10]

There is an additional and distinct reason plaintiff cannot be injured with respect to the USDA solicitation. MAPPS' challenge is to the FAR Council's decision not to promulgate a new regulation. Yet the this decision issued April 19, 2005, one year after the USDA solicitation in April 2004, and thus, the decision not to promulgate a new regulation could not have caused any injury before it occurred.[11]

In sum, the proffered affidavits do not demonstrate a cognizable injury resulting from the FAR Council's refusal to revise the disputed regulation. The Olson and Miller affidavits are insufficient to demonstrate an injury because neither of those individuals nor their firms could plausibly compete for the EPA contract. The Blackwell affidavit is insufficient because plaintiffs

---

procured via QBS. *See* 48 C.F.R. § 36.601-4(a)(1).

[10] It also bears mention that at oral argument on the motion to dismiss, MAPPS' counsel noted that some MAPPS members had been threatened with discipline when they sought to bid on non-QBS contract solicitations. Yet competent, admissible evidence of such threats does not appear in the summary judgment record. *See* Rule 56(e), Fed. R. Civ. P. (summary judgment affiant must be competent and set forth admissible facts).

[11] The government also asserts that the surveyor-affiants and their firms were not actually prohibited or deterred from competing for the USDA or EPA contracts, because Aerial Data was chosen as a subcontractor on the USDA contract. This argument fails. While the record does reflect that Aerial Data was a subcontractor to one of the respondents to the USDA solicitation, the second Blackwell affidavit also avers that the services provided in that capacity were not photogrammetry or surveying, and for purposes of resolving the government's summary judgment motion, that averment must be taken as true. If Blackwell's statement is credited, Aerial Data's participation does not defeat standing because the services it rendered are not required by state law to be performed by licensed persons, and thus surveyors would not have violated ethical prohibitions by rendering those services in the circumstances, notwithstanding that QBS procurement was not used.

have not met the standard elucidated in *MAPPS I* that, to be injured, the services the surveyor sought to bid on must not be of a type that the state of procurement requires to be performed by a licensed person.  Moreover, the affidavit does not demonstrate a plausible threat of discipline should a surveyor bid on non-QBS solicitations, or indeed any such threat at all.  To the contrary, the record reflects that the alleged prohibition on competitive bidding is unenforced.  Finally, the Blackwell affidavit cannot support standing because the USDA contract, for which Blackwell's firm allegedly could not bid because of the unlawful agency inaction, was procured before the agency action challenged, meaning the challenged agency inaction could not have caused plaintiff's putative inability to bid for the contract.  Because the affidavits do not aver a cognizable injury to the individual surveyors or their employer firms, MAPPS has no standing on their behalf.

For these reasons, the affidavits do not establish that an injury in fact was suffered by the individual surveyors or their firms, and accordingly, no standing exists.  Accordingly, summary judgment must be granted in favor of the government.

An appropriate Order will issue.[12]


Alexandria, Virginia  
June 14, 2007

_____/s_____  
T. S. Ellis, III  
United States District Judge

---

[12] Because MAPPS lacks standing, it is inappropriate to reach the merits, as Article III jurisdiction is lacking, and "when [jurisdiction] ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (citing *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).  Nor may a district court assume that Article III jurisdiction exists for the purposes of resolving the merits, even if the merits would be resolved in favor of the party who objects to federal jurisdiction. *Id.* at 93-101.